IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

RANDALL SCOTT ANDERSON,

Defendant.

CRIMINAL ACTION FILE
NO.  4:11-CR-006-RLV-WEJ

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Randall Scott Anderson's Motion
to Suppress Evidence [11].  The Court conducted an evidentiary hearing on said
Motion on April 19, 2011 [15], which has been transcribed [16].  The parties have
briefed the matter.  (See Post-Hr'g Br. Supp. Mot. Suppress [17] ("Def.'s Br.");
Gov't Resp. in Opp'n Def.'s Mot. Suppress [18] ("Govt.'s Br.").)  On the basis of
the testimony and evidence produced at that hearing, the undersigned **REPORTS**
that defendant made a knowing and voluntary waiver of his Miranda rights, and the
inventory search of his car did not violate his Fourth Amendment rights.  Therefore,
the undersigned **RECOMMENDS** that defendant's Motion to Suppress Evidence
be **DENIED**.

## I.      STATEMENT OF FACTS

### A.      The Introduction and Initial Meeting

In January 2011, Detective/Sergeant Tim Deal[1] of the Catoosa County Sheriff's Department made a posting on an adult social website catering to homosexuals called Bareback RT.  (Tr. 7, 39.)  Without listing specifics, the posting (made under a pseudonym) was looking for some kind of "taboo fun."  (Id. at 7, 40.) That posting received a response from someone calling himself, "Georgia Slave Meat."  (Id. at 7.)  Detective Deal then communicated with Georgia Slave Meat through Bareback RT's email system and through G-mail to let him know that his sons, ages 11 and 14, were exploring their sexuality, and that while he did not want to participate, he wanted to watch.  (Id. at 7-8, 40.)[2] Georgia Slave Meat replied that he was interested in talking with him about meeting the boys for sexual purposes, but that his "master" was even more interested.  (Id. at 8.)  Thus, Georgia Slave Meat introduced Detective Deal to the person he called his master, Randocom.  (Id.)  As

_____

[1] Detective Deal is also a founding member of the FBI's child exploitation task force.  (Tr. 4-5.)

[2] The children were fictitious.  (Tr. 40.)

2

was the case with Georgia Slave Meat, Detective Deal was introduced to Randocom through emails exchanged on Bareback RT and then on G-mail.  (Id. at 9.)

At some point, Georgia Slave Meat and Randocom wanted to meet with Detective Deal in person to reassure themselves that he was not a law enforcement officer.  (Tr. 9.)  Thus, they arranged a meeting in February 2011 at a Starbucks in Calhoun, Georgia.  (Id.)  Detective Deal told the other two that he would be driving a white Dodge pickup truck.  (Id.)  The detective–still in an undercover capacity–arrived first, went in to the Starbucks, picked a seat, and waited for them to arrive.  (Id. at 9-10.)[3]  In a few minutes, he saw two men exit a white Volvo.[4]  (Id. at 11.)  After meeting, the two men let Detective Deal know that they would be interesting in introducing his children to poppers (medication that helped relax the anus for sex) and having sex with them.  (Id. at 10-11.)  At the conclusion of the meeting, the two men left; no arrests were made.  (Id. at 11.)

_____

[3] In the mean time, Detective Deal had learned that Randocom was Randall Scott Anderson while Georgia Slave Meat was someone named Michael O'Rourke.  (Tr. 10, 37.)

[4] Detective Deal identified one of those two men in open court as defendant Anderson.  (Tr. 10.)  After this meeting, Detective Deal "ran" the tag number on the white Volvo and linked it to Mr. Anderson.  (Id. at 15.)

3

**B.**      <u>The Arrest</u>

Following this meeting at Starbucks, Detective Deal continued his communications, but they were almost exclusively with Mr. Anderson.  (Tr. 11.) They began to talk by telephone (which the detective recorded).  (<u>Id.</u>)  In one of those calls, Mr. Anderson relayed that he thought Mr. O'Rourke wanted to back out because he was afraid of getting in trouble, given that some of his friends had been arrested in these kinds of scenarios.  (<u>Id.</u> at 11-12.)[5]  Detective Deal replied that he did not want either of them to do anything they did not want to do.  (<u>Id.</u> at 12.)

Despite those reservations, Mr. Anderson continued to talk to Detective Deal about arranging a time and place for him to meet with the fictitious teenage boys for sex. (Tr. 12.)  Messrs. Anderson and Deal finally settled on a date (February 5) and a location (the Quality Inn on Alabama Highway in Ringgold) for the illicit rendezvous.  (<u>Id.</u>)  When Detective Deal was sure that Mr. Anderson was in transit, he picked up the decoy vehicle (the white Dodge pickup) and let the defendant know that he and the boys were in room 112.  (<u>Id.</u> at 12-13.)  The surveillance and arrest team then set up around that motel room.  (<u>Id.</u> at 13.)

---

[5] Detective Deal could not recall if either Mr. O'Rourke or Mr. Anderson asked him if was a law enforcement officer, but he testified that if they did, he told them he was not.  (Tr. 40.)

4

Detective Deal later observed a white Volvo pull into the parking lot at the Ringgold Quality Inn. (Tr. 13.)[6] The only occupant was the driver, Randall Scott Anderson. (Id.) Mr. Anderson got out of his car and knocked on the door at room 112. (Id. at 13-14.)[7] After he did that, Detective Greg Bates (of the Dalton Police Department) and Deputy Greg Cross (of the Catoosa County Sheriff's Department) drew their guns for officer safety, arrested Mr. Anderson, and placed him in handcuffs. (Id. at 14, 47-54, 62.)[8] As part of that felony arrest, the officers searched Mr. Anderson and removed items from his pockets (including a cell phone). (Id. at 16, 42.)

---

[6] Detective Deal confirmed through the tag number that this was the same car Mr. Anderson had driven to their earlier meeting at the Calhoun Starbucks. (Tr. 16.) Detective Deal identified the vehicle pictured in Government Exhibits 2-3 as defendant's white Volvo as it was parked at the Ringgold Quality Inn. (Id. at 19.)

[7] Officers had not actually rented room 112 that day. (Tr. 15.)

[8] Deputy Cross testified in detail about the arrest. (Tr. 47-55.) He explained that, when he announced to Mr. Anderson that he was under arrest and to get on the ground, the defendant displayed a stunned, "deer-in-the-headlights" look. (Id. at 50.) The defendant froze, and failed to comply with repeated commands to removed his hands from his pockets. (Id. at 52, 54-55.) When Officer Bates got close enough to put his hands on the defendant, he finally removed his hands from his pockets. (Id. at 53-54.) The defendant never attempted to flee. (Id. at 54.)

5

Mr. Anderson was then placed in the back of Deputy Cross's patrol car. (Tr. 14-15, 55.) Detective Deal did not ask Mr. Anderson any questions at the scene; Special Agent Ken Hillman introduced himself to Mr. Anderson, but did not ask him any questions at the scene. (Id. at 15.) Detective Deal "ran" Mr. Anderson's license to confirm the prior identification. (Id. at 16.) Defendant sat in the patrol car with his hands cuffed behind his back between seven and ten minutes before Deputy Cross transported him to the Sheriff's Office. (Id. at 22-23, 55, 57.) The drive from the scene to the Sheriff's Office took about three minutes. (Id. at 23, 57.) Deputy Bates said nothing to the defendant during that transport. (Id. at 57.)[9]

### C.   **The Vehicle Inventory**

Meanwhile, officers on the scene made an inventory of the items in Mr. Anderson's car pursuant to Catoosa County Sheriff Department policy, called a wrecker, and had the vehicle towed. (Tr. 16-17.)[10] During that inventory search,

---

[9] Deputy Bates testified that at no point during his interaction with the defendant (i.e, during his arrest, transport, or in the conference room) did he threaten him or promise him anything. (Tr. 59-60.) The only time Deputy Cross brandished his weapon was at the defendant's initial arrest. (Id. at 60.) Neither arresting officer discharged his firearm, "Tased" the defendant, or struck him with a baton. (Id.)

[10] The inventory policy directs officers to make an inventory of everything found in a vehicle, including items in unlocked containers. (Tr. 16-17.) This policy protects the officers from claims of theft; it also protects the vehicle owner in that he

officers opened the Volvo's trunk, the contents of which are pictured in Government Exhibit 4. (Id. at 20-21, 43.) The black bag on the left side of the photograph contained Mr. Anderson's computer (which agents seized and later obtained consent to search). (Id. at 21.) The brown bag on the right side of the photograph was inventoried as well and contained items relevant to the investigation, which were seized. (Id. at 21, 43-45.)

Government Exhibit 5 is a photograph of the Volvo's front seat taken from the passenger's side. (Tr. 21.) That photograph shows a piece of white paper in the passenger's seat that is of significance to the investigation. (Id. at 21-22.) The last photograph, Government Exhibit 6, is a close-up of that white piece of paper; it reflects the room number (112) at the Quality Inn (which was located behind the McDonald's and Ruby Tuesday's) and the exit number off of Interstate 75 (no. 348). (Id. at 22.) At the conclusion of the inventory search, any items removed were taken to the Catoosa County Sheriff's Department. (Id.)

---

receives a list of all items found therein to help prevent loss. (Id. at 17.) Since defendant had been arrested, and no one was with him who could be entrusted with the vehicle, officers impounded and inventoried it pursuant to the policy. (Id.) Given the inventory policy, officers did not ask Mr. Anderson for permission to search his vehicle. (Id. at 43.)

### D.   Interview at the Sheriff's Department

Upon arrival at the Catoosa County Sheriff's Department, Deputy Cross escorted the defendant to a conference room and sat with him.  (Tr. 23-24, 57-58.)  While in the conference room, Deputy Cross engaged in no conversation with Mr. Anderson.  (Id. at 58-59.)  About five or ten minutes later, Detective Deal removed Mr. Anderson from the conference room and escorted him to an interview room which contains audio and video equipment for the purpose of recording any statement he might make.  (Id. at 24, 59.)[11]

Before beginning the interview, Detective Deal advised Mr. Anderson of the Miranda rights using a written form.  (Tr. 24-25.)  That form is in evidence as Government Exhibit 7.  (Id. at 25-26.)  Before reading those rights to Mr. Anderson, Detective Deal assessed that the defendant was alert, coherent, and focused on the task at hand.  (Id. at 26.)  Moreover, the detective determined that the defendant had the ability to read and write in the English language, having completed more than thirteen years of schooling.  (Id. at 26-27.)

───────────────

[11] During transport between the two rooms, Detective Deal offered the defendant water and a bathroom break, but he declined both. (Tr. 24.)  When placed in the interview room, the handcuffs were removed.  (Id. at 35.)  He was again offered a drink of water but refused.  (Id.)

According to Detective Deal, he read each of the <u>Miranda</u> rights listed on "Rights Advisement/Waiver" form to Mr. Anderson. (Tr. 27.) After he read each right, he asked Mr Anderson if he understood, and if he did, to place his initial by each right. (<u>Id.</u>) Detective Deal's review of this form was recorded on video. (<u>Id.</u> at 28.) Detective Deal did not display a weapon to Mr. Anderson, make his any promises to him, or withhold any benefits from him, in order to induce him to sign the form. (<u>Id.</u>)

After review of each of the <u>Miranda</u> rights, Mr. Anderson signed the form. (Tr. 28.) Detective Deal and Deputy Bates witnessed defendant's signature. (<u>Id.</u> at 28-29.) Detective Deal explained to Mr. Anderson that, at any point during the interview, he could stop talking, but he never invoked that right. (Tr. 29, 39.) Mr. Anderson also never asked to speak to an attorney. (<u>Id.</u> at 29-30, 39.) He was also never refused water or a bathroom break. (<u>Id.</u> at 39.)

Detective Deal then asked for defendant's consent to search his cell phone and his laptop computer. (Tr. 30.) Written consent forms signed by Mr. Anderson for his cell phone and computer are in the record as Government Exhibits 8 and 9, respectively. (<u>Id.</u> at 30-31.) Detective Deal explained to the defendant that he did not have to provide his consent and that he could withdraw consent at anytime. (<u>Id.</u>

at 31-32.)  Mr. Anderson expressed no confusion and appeared to understand what Detective Deal was telling him.  (Id. at 32.)  Notably, Mr. Anderson even showed the agents how to use these devices.  (Id.)  As before, Detective Deal did not threaten Mr. Anderson or promise him any benefits in exchange for his signatures on the two consent to search forms.  (Id. at 32-33.)

Detective Deal asked Mr. Anderson no substantive questions about the case until after all three of these forms had been executed.  (Tr. 33.)  The testimony provided by the Detective is substantiated in the video of this interview, found in the record as Government Exhibit 10.  (Tr. 33-34.)  The Court's review of this video shows that Detective Deal and Deputy Cross at all times acted in a professional and courteous manner toward Mr. Anderson.

Near the conclusion of the interview, Detective Deal asked Mr. Anderson if he would be willing to make a call to Mr. O'Rourke (a/k/a Georgia Slave Meat), and that if he did, Detective Deal would inform the District Attorney's office of his cooperation.  (Tr. 45-46.)  However, Detective Deal made clear that he could make him no promises in exchange for making that call.  (Id.)  The defendant placed a call to Mr. O'Rourke.  (Id.)

10

Mr. Anderson took the stand at the suppression hearing.  He testified that he was "absolutely terrified" when the arresting officers drew their guns on him.  (Tr. 64.)  He claimed that, after seeing those guns, he thought that his cooperation from that point on would help him through the process.  (Id.)  The defendant testified that he was scared from the moment he encountered the officers through the time he signed the Miranda waiver.  (Id.)  Indeed, Mr. Anderson asserted that he felt like he had no choice but to sign the waiver.  (Id. at 64-65.)

On cross-examination, Mr. Anderson repeated that he was terrified when he was initially approached by the police officers with guns drawn.  (Tr. 65.)  However, he conceded that following his arrest, no one pointed a gun at him again.  (Id.)  Mr. Anderson also conceded that he did not perceive anything that Detective Deal said to him in the lead up to execution of the waiver form as threatening.  (Id. at 65-66.)  He was just still frightened and trying to cooperate with him.  (Id. at 66.)  Mr. Anderson also agreed that his terror related to the process, not a worry that someone was going to come in and point a gun at him.  (Id.)  He also never perceived, after that initial encounter with the police officers, that anyone was threatening him with physical violence.  (Id.)

11

## II.     THE CHARGING DOCUMENT

On February 22, 2011, the grand jury returned a single-count Indictment [1]

against Mr. Anderson, alleging as follows:

> Beginning on or about January 20, 2011, and continuing until on or about February 5, 2011, in the Northern District of Georgia, the defendant, RANDALL SCOTT ANDERSON a/k/a Randocom a/k/a ANDRCGA@aol.com, using a facility and means of interstate commerce, that is, an internet-connected electronic device, knowingly attempted to persuade, induce, and entice an individual who had not attained the age of 18 years to engage in sexual activity for which the defendant could be charged with a criminal offense, that is, child molestation (O.C.G.A. § 16-6-1), in violation of 18 U.S.C. § 2422 (b).

## III.    CONTENTIONS OF THE PARTIES

Defendant asserts that all evidence in this case should be suppressed based on

his defense of entrapment.  Defendant further asserts that all statements he made to

law enforcement officers should be suppressed because he remained fearful after

officers drew their weapons in conducting the arrest, and that the inventory search

of his vehicle was "simply a ruse for conducting an illegal search."  (See Def.'s Br.

2-12.)

The Government responds that the defense of entrapment is not a proper basis

for suppression of evidence.  Moreover, defendant received and voluntarily waived

his Miranda rights, and officers searched defendant's car pursuant to a valid vehicle

12

impound policy.  Thus, no basis exists to suppress defendant's statements or the physical evidence obtained from him.  (See generally Govt.'s Br.)

## IV.   ANALYSIS

In United States v. Donaldson, 4:10-CR-47-HLM, a recent case involving the same task force and the same defense counsel, this Court ruled that an entrapment defense, regardless of its merits at trial, is not a valid basis for the suppression of evidence.  See United States v. Hatney, 80 F.3d 458, 459 n.1 (11th Cir. 1996) (rejecting "without further discussion" argument that denial of suppression motion based on entrapment contention was abuse of discretion); United States v. Mitchell, 493 F.2d 9, 10-11 (5th Cir. 1974)[12] (rejecting as "devoid of merit" appellant's contention that trial court "erred in . . . refusing to suppress evidence which he claims was the product of the alleged entrapment"); Jeter v. McNeil, No. 5:08cv101-SPM/MD, 2009 WL 2495790, at *11 (N.D. Fla. Aug. 11, 2009) ("[E]ntrapment is an affirmative defense.  As a defense to a criminal charge, this concept does not provide for the suppression of evidence as a remedy.") (citations omitted); Roux v. United States, No. 2:07-cv-236-Ftm-29SPC, 2008 WL 2445794, at *3 (M.D. Fla.

---

[12] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

13

June 16, 2008) ("As defenses to a criminal charge, neither [entrapment nor outrageous government conduct] provides for the suppression of evidence as a remedy.").

Here, defense counsel acknowledges that ruling but seeks to preserve the issue. However, neither in <u>Donaldson</u> nor in this case has defense counsel cited any case that contradicts the above-cited precedent. Consequently, the Court again rejects the proposition that all evidence should be suppressed based on defendant's entrapment defense. This Court's present inquiry is limited to determining whether law enforcement officers violated defendant's constitutional rights when they obtained statements and evidence from him during and after the arrest.

In <u>Jackson v. Denno</u>, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury. Title 18 U.S.C. § 3501(a) codifies the <u>Jackson v. Denno</u> requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." <u>United States v. Davidson</u>, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

14

A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, the Court must consider whether the Government complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). The Court makes these inquiries separately below.

### A.    Compliance with Miranda

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

15

The testimony at the hearing shows that Detective Deal provided the <u>Miranda</u> rights to the defendant at the beginning of the video-recorded interview.  Defendant received those rights orally and in writing.  He executed a form indicating that he heard his rights and that he understood them.  Thus, the first prong of the two-part inquiry has been established.  Defendant does not argue otherwise.

### B.  <u>Voluntariness</u>

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice.  <u>Jones</u>, 32 F.3d at 1516.  In <u>Arizona v. Fulminate</u>, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances.  In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession.  <u>Jones</u>, 32 F.3d at 1516-17.  The standard applied in the Eleventh Circuit is as follows:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.  Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

16

Id. at 1517 (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992)), abrogated on other grounds, Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994).

In this case, the undisputed evidence shows that Mr. Anderson was not subjected to an exhaustingly long interrogation, promised anything, or deceived. There is no evidence that he was threatened or that he was unable to understand what was happening.  Defendant could read and speak English and did not appear to be under the influence of any drugs.  However, defendant argues that his waiver was involuntary because he remained fearful after the officers pointed their guns at him during the arrest.

It is understandable, and common, for defendants who are arrested at gunpoint to be fearful.  However, no constitutional violation occurred here.  There was no threat of force after the initial encounter (which defendant exacerbated by failing to remove his hands from his pockets as instructed).  The interview occurred at least 15-20 minutes later and the video shows defendant to be calm and cooperative. Moreover, defendant testified that his fear stemmed in part from thoughts of "what could happen" as a result of the arrest.  (See Tr. 67-68.)  Thus, under the totality of the circumstances, the Court concludes that Mr. Anderson made a knowing,

17

voluntary, and intelligent waiver of his right to remain silent. Therefore, defendant's Motion to Suppress should be **DENIED**.

### C.     Inventory Search of Defendant's Car

Lastly, defendant argues that the search of his car was improper because it was conducted for purposes of investigation and before the car was taken into impoundment. (Def.'s Br. 11.) However, the search in this case is analogous to that in Colorado v. Bertine, 479 U.S. 367 (1987), the case upon which defendant relies. In Bertine, police arrested the defendant for driving under the influence of alcohol. Id. at 368. Police inventoried the defendant's van "before the arrival of a tow truck," found contraband including cocaine in a closed backpack inside the van, and charged the defendant with possession of cocaine. Id. at 368-69. The Supreme Court held that the Fourth Amendment does not prohibit the state from proving its charges with evidence discovered during the inventory search. Id. at 369.

Similarly, the testimony here shows that law enforcement searched defendant's car pursuant to Catoosa County Sheriff Department policy.[13] Here, as

---

[13] Given the policy's aims of preventing theft and loss, it makes sense for police to inventory the car's contents before relinquishing custody to a wrecker. See Bertine, 479 U.S. at 373 ("[T]he security of the storage facility does not completely eliminate the need for inventorying; the police may still wish to protect themselves or the owners of the lot against false claims of theft or dangerous instrumentalities.").

18

in <u>Bertine</u>, there is no showing that law enforcement "acted in bad faith or for the sole purpose of investigation." 479 U.S. at 372. Thus, no grounds exist to suppress this evidence.

## V.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Evidence [11] be **DENIED**.

**SO RECOMMENDED**, this 21st day of June, 2011.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

     v.

RANDALL SCOTT ANDERSON,

     Defendant.

CRIMINAL ACTION FILE
NO. 4:11-CR-06-RLV-WEJ

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  Failure to object to this Non-Final Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 58(b)(2).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 21st day of June, 2011.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2